This suit results from an intersectional automobile collision at the corner of Carrollton Avenue and Banks Street at about 6 o'clock in the evening of December 29, 1942. Banks Street has two driveways each 28 feet in width, separated by a neutral ground 8 1/2 feet in width. Carrollton Avenue, one of the larger thoroughfares of New Orleans, also has two driveways, each 36 feet wide, separated by a neutral ground 38 feet in width. At this corner there is a traffic semaphore signal for the purpose of controlling vehicular traffic. Defendant's truck, driven by its employee, Jones, was on its way in Banks Street towards the business section of New Orleans, and Mr. and Mrs. Kientz were in their Chevrolet automobile going toward Canal Street on Carrollton Avenue, he operating the car, and she on the front seat to his right.
The truck of defendants had crossed the first roadway of Carrollton Avenue, had passed beyond the neutral ground and had entered the other driveway on its way across, when it was struck on its right side and turned over by the Chevrolet car in which plaintiffs were riding. Mrs. Kientz sustained physical injuries and she seeks to be compensated for her pain and suffering and her loss of earnings while disabled, and Mr. Kientz, as head of the community, asks for judgment for the amount of the medical expenses of Mrs. Kientz.
Petitioners allege that as their car approached the intersection "because of the absence of a traffic signal" Mr. Kientz "did not slacken or reduce his speed" and did not "come to a stop prior to entering said intersection." They also allege that defendants' driver, Jones, did not look to see whether any vehicle was approaching from his right on the lower side of Carrollton Avenue, and Mrs. Kientz avers that had he done so he would have realized that their car "was travelling at such a rate of speed as to make it impossible" for her husband to stop it "prior to entering said intersection." They charge that the failure of Jones to look was negligence which caused, or at least contributed to the cause of the accident.
Defendants admit the occurrence of the collision but deny any negligence on the part of the driver. They aver that as the *Page 508 
truck approached Carrollton Avenue the driver brought it to a stop as the traffic signal showed "red", and that when the said signal had turned "green", he, the driver, started the truck at a slow speed and crossed the first roadway, passed the neutral ground of Carrollton Avenue and had entered the other or lower roadway when the said truck was struck by plaintiffs' Chevrolet which had entered the intersection, in spite of the fact that a "red" or unfavorable light was facing it, and that the said Kientz drove the Chevrolet into the intersection without stopping; that he was not keeping a lookout, and that he was operating the Chevrolet at an excessive speed.
There was judgment below in favor of Mrs. Kientz alone for $150 for her pain and suffering, and defendants have appealed. Mrs. Kientz has answered the appeal praying that the amount awarded her be increased to $300, as originally prayed for.
The record leaves no doubt that the primary cause of the accident was the defective condition of the traffic light. The light bulb which should have shown through the red glass towards Mr. and Mrs. Kientz, had burned out so that although when viewed from the other direction there was a green light, indicating to defendants' driver that traffic might cross in that direction, there was no red light indicating to Kientz that he should stop.
Kientz says that the amber light was showing towards him when he was about three-quarters of a block away and that it continued to show amber until he reached the crossing, and this led him to believe that the automatic operation of the semaphore had been turned off so that, from all directions, the light would show amber indicating that any vehicle might cross without stopping, but that all vehicles must exercise caution. He must have been mistaken in saying that that light continued on amber because all other witnesses, who looked at the light afterwards, said that it was changing regularly from red to amber to green and vice versa from all directions except that from the one direction from which Kientz was approaching, the red light did not light when it should have done so. In other words that from that side as the light turned from green to amber, and then should have turned to red, the amber light went out entirely and no light at all showed towards Kientz. This is unimportant, however, because there can be no doubt that Kientz was negligent in entering the intersection as he did — whether he was faced with a red light, — a caution light or no light at all. This fact is conceded by counsel for plaintiffs who say that insofar as the judgment rejects the claim of Mr. Kientz, it is correct.
It is contended, however, that the negligence of Mr. Kientz is not to be imputed to his wife and that, therefore, if the defendants' driver was also guilty of such fault as had causal connection with the ensuing collision, she, Mrs. Kientz, may recover from defendants as a joint tort feasor in spite of the negligence of her husband. Of course, this is true. Vitale v. Checker Cab Co., 166 La. 527, 117 So. 579, 59 A.L.R. 148; McLellan v. N.O. N.E.R.R. Co., 13 La.App. 581, 127 So. 648. Mrs. Kientz then can recover if the negligence of Jones contributed to the accident, unless she, herself was guilty of contributory negligence. This it may be necessary for us to discuss later since defendants charge her with independent negligence in that she failed to warn her husband about the excessive speed or about entering the intersection while the truck was crossing.
It is admitted that when Jones' truck entered the second or lower roadway of Carrollton Avenue, he did not look to his right to see if any vehicle was about to enter the intersection from that direction, and, of course, it is apparent that if he had looked he would have seen the approaching Chevrolet. He says that he looked as he entered the first roadway, that he had seen nothing on his left on that first roadway, and had then looked to his right to see if anything was approaching on the second, or more distant roadway and that "there was nothing coming to my right." He states that he then proceeded across without again looking to his right. He crossed the 36 feet of the first roadway, and the 38 feet of the neutral ground, and the whole of his truck had entered the second roadway when he was struck. During all of this time the light facing him remained green, and, in fact, it was still green when the Chevrolet struck his truck.
It is contended on behalf of plaintiffs that there should be applied here the doctrine which was applied in the case of Thomas v. Roberts, La.App., 144 So. 70, which is to the effect that when a driver is crossing an intersection on a favorable light, he cannot close his eyes to obvious *Page 509 
danger and proceed across if by a mere glance, which a person exercising only ordinary care might make, he would have seen that there was danger from another vehicle crossing in violation of traffic laws. We think that doctrine sound in spite of unfavorable criticism of our former decision. See 7 Tulane Law Review 463 and Long v. White, La.App., 149 So. 133.
The criticisms which have been directed at the views expressed by us in Thomas v. Roberts, supra, result, we think, from a misunderstanding of what we said and of the facts of that case. For instance, in 7 Tulane Law Review, at page 465, it is suggested that that decision "has the effect of encouraging open violations of traffic ordinances by placing a strict duty upon autoists to look for such violators, and by precluding recovery for damages if this duty is not complied with, * * *."
We note the word "strict" and we note too that no where in that decision did we say or intimate that there is a strict duty of care on the driver who is proceeding on the favorable light. We said merely that he should have exercised "reasonable" care; that "the drivers of both cars to his left saw the truck coming, and the driver of the third car, which was behind his car, also saw the truck * * *" and we said that he should have seen it had he looked, and that under those facts he could not close his eyes, proceed into the intersection and then defend on the ground that he had the right of way.
It must be conceded that the facts of the Thomas case are somewhat different from those shown here, and it is only referred to because it follows the principle which is well established that a right of way or a favorable light does not absolve a driver from his duty to exercise care. In Buckley v. Featherstone Garage, Inc., 11 La.App. 564, 123 So. 446, 450, the Court of Appeal for the Second Circuit, through Judge Odom, then a member of that court, said:
"* * * In a city where traffic is controlled by the signal light system, neither pedestrians nor vehicles are permitted to enter an intersection on the wrong signal, and to do so is negligence. But the driver of a vehicle who is rightfully in the intersection owes a duty to those who may be negligently therein, and that duty is not only to avoid injuring them when and if their peril is discovered, if he can reasonably do so, but, further, to use due diligence to discover their presence."
In Holderith et ux. v. Zilbermann et al., 151 So. 670, 673, we said:
"* * * While it is true that the defendant Vasterling had the right of way under the traffic ordinance, neither the provisions of the traffic ordinance nor the general rules of negligence relieved him of the duty of maintaining an adequate lookout. In other words, the right of way granted by the city traffic ordinance is not an unconditional and absolute right of way. Section 7, article 1, and article 2, Traffic Ordinance No. 7490 C.C.S."
In the Holderith case we quoted from Kerns v. Lewis, 246 Mich. 423, 424, 224 N.W. 647, a statement which we think appropriate here.
"`While the law accords the right of way, it requires, as well, the exercise of at least "horse sense." The statute does not authorize one, in approaching a highway crossing, to assume that in all events he may proceed without looking, or, if unable to see, without exercising precaution commensurate with reasonable prudence.'"
See also Upton v. Bell Cabs, La.App., 154 So. 359, and Capillon v. Lengsfield, La.App., 171 So. 194.
We do not think that that doctrine should be extended beyond the limit at which it was applied in the Thomas case and have so expressed ourselves in Manuel v. Bradford, 166 So. 657, 658, in which we said:
"But this doctrine should be applied only where the danger is open and obvious and where a reasonably prudent person would observe it and avoid it, for ordinarily a driver may assume that other persons will obey the law and will not attempt to cross in violation of a `right of way'. In other words a driver situated as was Manuel need not exercise that high degree of care which he should have observed had he not been favored and protected to some extent by the traffic light."
But we do not think that it is an extension of the doctrine to apply it to the facts here. Rather the contrary, for in the Thomas case there were other vehicles to the left of the driver of the Thomas car which interfered, to some extent, with his view and there might have been some very slight justification for his failing to see the truck which was approaching on the other side of those cars. But here there was not the slightest thing to interfere with the *Page 510 
view of Jones and there was no other traffic ahead of him, and there were no pedestrians to require his attention, and, therefore, there was not the slightest justification for his failing to see the Kientz car — the slightest glance would have sufficed and had he seen it he would not have been justified in completely disregarding it unless it was obvious that its driver intended to bring it to a stop.
However, the failure of Jones to look to his right, as we think he should have done under the doctrine discussed, cannot be pointed to as a contributing cause of the accident unless it can be said that if he had looked and had seen the approaching Chevrolet, he would have realized that its driver, Kientz, was not going to stop before entering the intersection. In the Thomas case, the fact that the other vehicle was crossing the neutral ground, on which were situated street-car tracks, and was crossing at "an excessive speed" should have made it apparent to the driver of the Thomas car that the other vehicle could not be stopped but must necessarily continue into the very roadway in which the Thomas vehicle was about to be driven. Therefore, the fault of the driver of the Thomas car in failing to look to his left was a fault without which the accident would not have occurred because had he looked he would have seen, and having seen, would have appreciated the obvious danger of proceeding. Can the same be said here?
Jones was proceeding on a favorable light. There was no other vehicle which had already entered the intersection and which must, therefore, of necessity, continue, and it is well known that many drivers, while approaching red lights, continue at a fair speed until their vehicles are almost at the intersection and then suddenly bring them to a stop. Unless then, it was obvious that Kientz could not do so, Jones would have been justified in assuming that he would do so since, so far as Jones knew, the light, being favorable to him, was unfavorable to Kientz.
The speed of Kientz and that alone is relied upon by Mrs. Kientz as justifying the conclusion that Jones, had he looked, would have realized that Kientz could not stop before entering the intersection. What is the evidence as to that speed? In their answer defendants charge that Kientz "was driving at such a fast and excessive speed that he was thereby prevented from having proper control over the operation of his car." And Kientz says that as he reached the intersection his car was running at "around 25 or 30 miles an hour." Mrs. Kientz has no idea about the speed of the Chevrolet. The most significant testimony on this point is given by DeBenidetto who, testifying on behalf of defendants, says that he realized that there would be a collision as he saw the two vehicles approaching the corner. He was on the sidewalk very near by and he saw both cars. He saw that the light was red and that Kientz should have stopped, but says that as he saw Kientz approach "I was looking for an accident." We understand this statement to mean that he realized from what he saw that Kientz was not going to stop. It is true that he also said that he wondered which of the vehicles would stop, but he followed this by the statements which we have quoted which obviously mean that as the vehicles approached he realized that since Kientz should stop and was not going to do so, there would be an accident. And if DeBenidetto realized this from what he could see, surely Jones must have realized the same thing had he seen the Chevrolet. Then, too the speed of the Chevrolet is evidenced by the fact that though the heavier vehicle, defendants' truck was going at a much slower speed, it was turned over on its side by the impact of the lighter Chevrolet — and it was not only turned over but, as it was struck, it was raised up in the rear by the force of the blow. Warren, also a witness for the defendants, says: "The truck seemed to raise up in back and tip over."
We have done considerable calculating, taking into consideration the relative speeds of the two cars, in an effort to determine just how far from the intersection the truck was when its driver should have realized, had he looked, that because of the speed of the Chevrolet, it was no longer within the power of its driver to stop it. And we conclude that when the Chevrolet was still some thirty or forty feet from the crossing, and was going at what seems to have been an excessive speed, it was apparent that its driver did not intend to stop and that then Jones, going at a more moderate speed, was about fifteen or twenty feet from the corner and that he could easily have stopped had he been looking. Although Jones had looked when he first entered Carrollton Avenue, he had not done his full duty in that regard. He had travelled more than eighty feet between the *Page 511 
time at which he says he looked to the right and the time at which he was struck from that directing — and only from that direction could he have been struck since that was a "one-way" roadway. One second or even a fraction thereof would have been all the time required for such a glance.
Our views as expressed in Manuel v. Bradford, supra, are not inconsistent with our present view. There, as Manuel was about to enter the intersection on a favorable light, he saw the other vehicle driven by Bradford some 80 or 90 feet away, and while its speed was about 30 or 35 miles an hour. We held that he was justified in assuming that Bradford would bring his car to a stop since the light was against Bradford, and since there then remained ample distance within which he could have stopped. We say the same thing here; that had Jones looked he would have been justified in continuing so long as it was not apparent that Kientz either was not looking or did not intend to stop, and we think that the facts here justify the conclusion that had Jones looked, he would have realized that Kientz did not intend to stop and that his speed was such that he could not stop. He cannot be heard to say "I did not look but if I had I would have seen no danger", unless the facts clearly show that had he looked he would have been justified in going ahead.
We do not think that Mrs. Kientz can be said to have been guilty of contributory negligence. She is not an automobile driver and, therefore, cannot be said to be familiar with speeds or with the distance required to stop automobiles. While the speed of her car was excessive, in view of the fact that it was about to enter an intersection, it cannot be said that that speed was excessive when the car was some 60 or 70 feet away from the intersection, because in that distance it could easily have been brought to a stop. And, therefore, it would not be proper to say that she should have realized that her husband was not going to stop until she got very near to the corner, and we do not think that when she did so there yet remained time for her to make an effective protest.
When we come to consider the quantum we reach the conclusion that the amount allowed her for her pain and suffering was about the proper amount. She was struck in the stomach and she was bleeding from her inner right thigh, her right knee and her left leg. She was taken to her mother's, where she remained in bed for five days. At the time of the trial she stated that the scar on her lower left leg was still visible. She also said: "I had to take diathermy treatment for twenty-five days."
The other two items claimed, $21.75 for medical expenses for which the husband asserted the claim, and $175 for loss of salary, which Mrs. Kientz herself presented, were properly rejected. The judge a quo was obviously correct when he dismissed the claim of Mrs. Kientz for her loss of earnings, since those earnings formed part of the community of acquets and gains existing between her husband and herself, and claim for them should have been made by the husband as head and master of that community. If he had made the claim, he would not have been successful because his own contributory negligence would have barred recovery. That earnings of the wife, while living with the husband, fall into the community is no longer a debatable question since the Supreme Court of Louisiana in Houghton v. Hall, 177 La. 237, 148 So. 37, 43, considered the effect of Civil Code Arts. 2334 and 2402, as they are affected by Acts 68 of 1902, 170 of 1912 and 186 of 1920, and said that it had "* * * reached the conclusion that the earnings of the wife, whether she be conducting a separate business or pursuing a separate occupation from her husband, while living with him, under the régime of the community, are community property, * * *." The court considered a most thorough and interesting treatise of Dr. Harriet S. Daggett, Professor of Law, Louisiana State University, "The Community Property System of Louisiana with Comparative Studies," in which the author sought to show that whether the wife be living with her husband or not, the earnings of her separate industry are her separate property, and the Supreme Court also said that The Tulane Law Review, in Vol. 4, No. 2, p. 281, and Loyola Law Journal, Vol. 11, No. 1, p. 28, take the same position, but the court added that it "has reached a different conclusion from that reached by Dr. Daggett and the two law reviews." The question is also discussed in another article by Dr. Daggett in which she says that:
"The wife's earnings under rather clear Louisiana statutory language, belong to the wife's separate estate; but in order to prevent another item of unbalance, the court has declared them community property." *Page 512 
The Oklahoma Community Act, La. Law Review, Vol. 2, No. 4, p. 582.
In view of the clear and unambiguous statement of the Supreme Court, we have no hesitation in saying that the question is no longer an open one. See also Succession of Howell, 177 La. 276,148 So. 48; Burns v. Rivero, 192 La. 767, 189 So. 129.
The claim asserted by Mr. Kientz for medical expenses was properly disallowed for the same reason, i.e., his own contributory negligence.
For these reasons the judgment appealed from is affirmed at the cost of appellants.
Affirmed.